UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JOSE E. MEDINA,

                Plaintiff,

    - against -

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
-------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
17-CV-6885 (RRM)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

      Plaintiff Jose E. Medina, who pled guilty to wrongfully obtaining Social Security

Disability Insurance ("SSDI") benefits and agreed to repay those benefits in order to settle a

related forfeiture action, now brings this action against the Commissioner of Social Security,

principally arguing that the Social Security Administration ("SSA") deprived him of due process

by failing to afford him 1) an opportunity to challenge the finding that fraud was involved in his

SSDI application and 2) a hearing to determine whether Medina was entitled to the very SSDI

benefits that were the subject of the earlier criminal and civil proceedings.  Medina and the

Commissioner now cross-move for judgment on the pleadings, with the Commissioner arguing,

among other things, that the SSA's administrative process properly afforded preclusive effect to

Medina's admission in the criminal and forfeiture proceedings.

      For the reasons set forth below, the Commissioner's motion is granted, Medina's motion

is denied, and this action is dismissed.

## BACKGROUND

      The following facts are drawn from the Administrative Record ("AR") (Doc. No. 30),

and from the Affidavit of Jose E. Medina, Jr., dated April 4, 2019, (the "Medina Affidavit")

(Doc. No. 25-1).  Except as otherwise indicated, these facts are not in dispute.

Medina was born on June 20, 1963, and graduated high school in 1981.  (AR 134, 140.)[1] From January 1988 through September 30, 2007, he worked as a police officer for the New York City Police Department ("NYPD").  (AR 130, 137.)  During that period, he suffered several injuries in the line of duty, at least three of which required surgery.  First, in July 2001, he suffered an injury to his right knee while chasing a perpetrator.  (Medina Aff. ¶ 3.)  He had an MRI on December 26, 2001, which indicated that he had a tear in the medial meniscus.  (AR 193.)  Dr. Arnold Goldman, the NYPD's orthopedic surgeon approved surgery on March 14, 2002, but Medina did not have arthroscopic surgery to repair the damage until December 16, 2002.  (AR 245.)  By that time, Medina had complex tears of both the medial and lateral menisci and a large amount of hypertrophic synovitis – *i.e.*, thickening and inflammation of the synovium, the connective tissue that lines the inside of the bubble-like structure that surrounds the knee joint.  (*Id.*; *see* https://www.hss.edu/condition-list_synovitis.asp).  The surgeon, Dr. Francis Lanzone, shaved down the synovium to access the joint and performed partial meniscectomies, removing portions of the "shredded" medial meniscus and the torn lateral meniscus.  (AR 245.)  Medina underwent "extensive physical therapy" following the surgery, then returned to full duty.  (AR 263.)

In March 2, 2004, Medina suffered an injury to his left knee while jumping over fences in pursuit of a perpetrator.  (Medina Aff. ¶ 6.)  After trying conservative treatments, including physical therapy and anti-inflammatory drugs, Medina had an MRI on January 28, 2005, which revealed a horizontal tear in the lateral meniscus.  (AR 242, 248.)  Dr. Goldman approved surgery on April 8, 2005, and Dr. Lanzone performed a second arthroscopic surgery on May 9, 2005.  (AR 173, 248, 263.)  That surgery revealed not only a parrot-beak type tear in the lateral

---

[1] Numbers preceded by "AR" denote pages in the Administrative Record.

meniscus but also osteochondritis of the medial femoral condyle.  (AR 173, 248.)[2]  Dr. Lanzone performed a partial meniscectomy and an abrasion chondroplasty to smooth the damaged portion of the condyle.  (*Id.*)  Following the surgery, Medina applied for disability retirement, but that application was denied by the Medical Board of the Police Pension Fund.  (AR 263.)

On April 13, 2005, Medina sustained an injury to his right shoulder while attempting to effect an arrest.  (AR 263; Medina Aff. ¶ 7.)  He went to the Emergency Department of the New York Medical Center of Queens, where X-rays of the shoulder proved negative.  (AR 208, 236–37, 263.)  Although the emergency room doctors diagnosed a shoulder sprain and told him to follow up with the hospital's orthopedic clinic, (AR 239), Medina went to Dr. Lanzone, who ordered an MRI.  (AR 241.)  While that study did not show any evidence of a rotator cuff tear, it did show degenerative changes at the acromioclavicular, or AC, joint, with some impingement on the rotator cuff.  (AR 241.)[3]  Dr. Lanzone diagnosed Medina with both impingement syndrome and a partial tear of the rotator cuff and performed a third arthroscopic surgery on August 5, 2005.  (AR 243.)  The doctor shaved away part of the acromion to relieve the impingement and, after removing a bursa (a fluid-filled sac or saclike cavity), used a thermoelectric wand to release the coracoacromial ligament.  (AR 243.)

Following surgery, Medina attended physical therapy ("PT") for a period of approximately two years, during which he worked "off and on" at a desk job.  (Medina Aff. ¶ 8; AR 129.)  His recovery did not proceed smoothly, as evidenced by the fact that Medina followed up with Dr. Lanzone on 25 occasions from August 11, 2005, to January 9, 2007.  (AR 264.)  At

---

[2] Osteochondritis (also called osteochondritis dissecans) is a condition that occurs when a lack of blood to the joint causes the bone inside to soften.  *See* https://my.clevelandclinic.org/health/diseases/21073-osteochondritis-dissecans.  In this case, the bone involved was a condyle, one of two rounded protuberances at the bottom of the femur or thigh bone.

[3] The AC joint is where the collarbone, or clavicle, meets a portion of the shoulder blade called the acromion.  *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/ac-joint-problems.

some point in 2005, Medina applied for disability retirement.  (AR 263.)  In support of this application, Dr. Lanzone wrote to the Article II Medical Board of the Police Pension Fund on three occasions to recommend that Medina be retired from the NYPD.  On October 21, 2005, Dr. Lanzone wrote that Medina had "weakness and pain" in both knees and his right shoulder which would prevent him from climbing or running up or down stairs.  (AR 261.)  Dr. Lanzone repeated that assessment ten days later in a letter dated November 1, 2005, but added that Medina's quadriceps and right deltoid had atrophied; that he had crepitus and swelling in the knees, and had a "positive impingement test" in the right shoulder.  (AR 259.)  However, Dr. Lanzone's assessments were contradicted by Dr. Arnold Goldman, the NYPD's surgeon who examined Medina on December 29, 2005, and opined that Medina's prognosis was good.  (AR 264.)  The doctor authorized PT for the right shoulder and left knee and placed Medina on "limited capacity."  (*Id.*)

On March 2, 2006, Dr. Lanzone wrote a third letter, noting that Medina had a limited range of motion in the right knee and shoulder and opining that he could not stand for more than 15 minutes, sit for more than an hour, or run or jump. (AR 256–57.)  On April 17, 2006, Medina appeared before the Article II Medical Board of the Police Pension Fund, which found – contrary of Dr. Lanzone's findings – that Medina had a normal range of motion both knees and no atrophy in either knee.  (AR 263.)  The Medical Board recommended disapproval of the retirement application.

In 2006, Dr. Goldman examined Medina four more times, re-authorizing physical therapy for the right shoulder and left knee on each occasion.  On May 25, 2006, the doctor opined that Medina's prognosis was fair, and placed him on "restricted duty."  (AR 264.)  On July 17, 2006, Dr. Goldman found the prognosis was fair for the right shoulder.  (*Id.*)  On October 5 and

4

December 7, 2006, the doctor again opined that Medina's prognosis was fair and continued him
on restricted duty.  (AR 265.)

On December 8, 2006, Medina reapplied for Accident Disability Retirement.  (AR 262.)
In support of that application, Dr. Lanzone sent the Medical Board a letter dated March 1, 2007,
which again opined that Medina could not stand for more than 15 minutes, sit for more than an
hour, or run or jump.  (AR 254–55.)  On April 2, 2007, the Medical Board examined Medina
again.  Although the Board noted that Medina walked with a "minimal limp" on the right side
and had difficulty standing on his heels and toes and squatting down, its findings with respect to
Medina's knees were largely normal.  (AR 265–66.)  In contrast, the Board found that Medina's
range of motion in the right shoulder was limited and "very painful," that the "impingement sign
on the right shoulder was at 70° and was acutely positive," and that there was some atrophy in
the right deltoid area.  (AR 265.)  The Board was unable to assess Medina's muscle strength in
the upper right extremity because Medina was in "significant pain" during this portion of the
examination.  (*Id.*)  The Board diagnosed Medina with "Chronic Derangement of the Right
Shoulder Status Post Arthroscopic Surgery with Residuals," opined that there were "significant
objective findings" precluding him from performing the full duties of an NYPD officer, and
recommended that his application for Accident Disability Retirement be granted.  (AR 266.)  The
Record does not indicate when Board of Trustees of the Police Pension Fund acted on this
recommendation, but Medina retired on September 30, 2007.  (AR 129.)

On June 15, 2007, Medina began seeing Dr. Edward R. Sodaro, Jr., a psychiatrist,
because he was feeling depressed and anxious.  (Medina Aff. ¶ 13; AR 132.)  Dr. Sodaro
diagnosed Medina with major depression and post-traumatic stress disorder ("PTSD").  (AR
132.)  The doctor prescribed psychotherapy and various medications: Citalopram, an
antidepressant; Xanax, a sedative, to treat his anxiety; and Ambien for insomnia.  (AR 132–33.)

The SSDI Application

At some point, Medina met a man named Thomas Hale, who professed to be an attorney who could assist him in applying for Social Security benefits.  (Medina Aff. ¶ 10.)  Medina is uncertain as to precisely when he met Hale – recalling that it was either shortly before or after his retirement, (*id.* ¶ 10) – but states that he did not meet Hale until sometime after he began visiting Dr. Sodaro, (*id.* ¶ 13).  While Medina states that Hale completed and submitted an application for SSDI on his behalf, (*id.* ¶ 11), no such application appears in the Administrative Record.  However, the fact that the Administrative Record lists a "protective filing date" of June 11, 2008, (AR 140), suggests that someone contacted the SSA with respect to Medina's claim on that date.[4]

On November 1, 2008, Medina retained an attorney named Raymond G. Lavallee to prosecute his claim for Social Security benefits.  (AR 52.)  That same day, Lavallee helped Medina to file an Application for SSDI, which alleged that Medina had been unable to work since September 30, 2007.  (AR 110.)  That application listed both mental and physical impairments, stating that Medina was suffering from a major depressive disorder, PTSD, and pain in both knees and his right shoulder.  (*Id.*)

In connection with this application, Lavallee submitted two psychiatric evaluations from Dr. Sodaro: one dated September 29, 2008, (AR 268–273), and one dated March 11, 2009, (AR 293–99.)  Both evaluations indicated that Medina was suffering from a major depressive disorder and PTSD, and exhibited features of an avoidant personality disorder.  (AR 272, 298.)[5]  Both evaluations stated that Medina was receiving "ongoing cognitive behavioral psychotherapy" and

---

[4] The record reflects a protective filing date of June 11, 2008.  The protective filing date is the date the applicant first contacts the SSA indicating an intent to file an SSDI application.

[5] People with avoidant personality disorder avoid social situations due to fear of rejection and being judged by others.  *See* https://my.clevelandclinic.org/health/diseases/9761-avoidant-personality-disorder.

taking anti-depressants, but was showing "minimal gains" and functioning a "a poor level."  (AR 273, 299.)  In addition, the evaluations stated that Medina suffered from narcolepsy and sleep apnea, a chronic sinus condition from working at Ground Zero from September 2001 to February 2002, and diminished pulmonary function.  (AR 269–70, 294–95.)

Medina's application was processed by the New York State Office of Temporary and Disability Assistance ("OTDA"), which referred Medina to Louis Tranese, D.O., for a consultative orthopedic examination.  In a report dated February 18, 2009, Dr. Tranese opined that Medina had moderate limitations in performing overhead activities and in lifting and carrying heavy objects with his right arm, but no limitations in using his hands for fine and gross manual activities.  (AR 290.)  He further opined that Medina had moderate limitations in his abilities to squat, kneel, crouch, and climb stairs frequently and mild to moderate limitations in his abilities to stand for long period or walk long distances.  (*Id.*)  However, the doctor perceived no other physical functional deficits.  (*Id.*)

The OTDA also referred Medina for a consultative psychiatric examination, but Medina thrice failed to appear.  (AR 324.)  In addition, the OTDA Examiner had difficulty obtaining Medina's medical records.  The Examiner obtained Dr. Lanzone's operative reports and a few other documents from Day-Op Center of Long Island, where the operations occurred.  (AR 40.)  The Examiner also obtained records from New York Hospital Medical Center of Queens relating to Medina's April 13, 2005, visit and a March 4, 2004, visit to the Emergency Department in which Medina principally complained of chest pains.  However, the Examiner did not obtain charts or other office records from Drs. Lanzone or Sodaro.

On May 7, 2009, the Examiner denied Medina's application for SSDI benefits.  In his Explanation of Determination, the Examiner noted that, although the OTDA contacted Medina's medical sources, it was "unable to obtain all the evidence … needed" to ascertain the severity of

Medina's conditions.  (AR 57, 61.)  The Examiner did not expressly mention Medina's failure to

appear for the consultative psychiatric examinations, but paperwork contained in the

Administrative Record indicates that the SSDI application was denied both due to Medina's

failure to cooperate with the Examiner's efforts to obtain medical records and to submit to a

consultative psychiatric examination.  (*See* AR 118.)

On May 11, 2009, Lavallee filed a request for a hearing before an Administrative Law

Judge ("ALJ").  (AR 62.)  That request asserted that Medina was "totally disabled as evidenced

by the medical reports submitted by … treating psychiatrist Dr. … Sodaro and Dr. … Lanzone

…."  (*Id.*)  In early April 2011, ALJ David Z. Nisnewitz scheduled a hearing for June 7, 2011.

(AR 63.)  At or about that time, the ALJ also issued letter requesting that a psychologist, Sharon

Grand, Ph.D., attend the hearing.  (AR 77.)

On May 13, 2011, Medina was examined and evaluated by Dr. Stephen G. Zolan, an

orthopedist, apparently at the request of Lavallee.  (AR 327–29.)  Dr. Zolan opined that Medina

"basically ha[d] frozen shoulder" on his dominant right side, making it "almost impossible … to

do physical work of any sort."  (AR 328.)  This condition not only prevented him from carrying

or lifting more than ten pounds and doing overhead or repetitive work, but also limited his "fine

manipulative functionality."  (AR 329.)  Dr. Zolan also found that Medina had arthritis in the

weight-bearing joints in his lower extremities which limited his ability to stand and sit.  (*Id.*)

The doctor opined that Medina's "poor functional capacities" rendered him "unfit, not only for

the occupation of a police officer …, but for physical or sedentary occupations of any sort …."

(*Id.*)  Dr. Zolan believed that these conditions were permanent and unlikely to improve with

treatment.  (*Id.*)

Although Dr. Grand and a vocational expert appeared at the June 7, 2011, hearing, (AR

28), the Administrative Record does not include a transcript of the hearing, so the Court does not

know whether these experts testified or what they said.  The Court notes, however, that ALJ

Nisnewitz did not rely on their testimony in his June 24, 2011, decision, which held that Medina

was disabled as of September 30, 2007.  (AR 28–35.)  In contrast, the ALJ gave "significant

probative weight" to the opinions of Drs. Zolan and Sodaro, finding that they had "support in the

medical record."  (AR 34.)

　　　In holding that Medina was disabled, the ALJ followed the five-step sequential process

for making disability determinations, which is prescribed in 20 CFR §§ 404.1520(a) and

416.920(a).[6]  First, the ALJ determined that Medina had not engaged in substantial gainful

activity since September 30, 2007.  (AR 30.)  Second, ALJ Nisnewitz held that Medina had

medically determinable severe impairments.  (*Id.*)  The ALJ did not specifically identify these

impairments, stating only that Medina alleged "a combination of physical and mental

impairments" and that the medical record established that Medina had sustained "a series of

orthopedic injuries" during the course of his employment as a police officer.  (*Id.*)  However, in

reaching that conclusion, the ALJ relied in large part on the reports of Drs. Sodaro and Zolan.

(AR 31–32.)

　　　At the third step of the analysis, the ALJ found that Medina did not have an impairment

or combination of impairments that met or medically equaled one of the impairments listed in 20

---

[6] The Second Circuit has described this five-step process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful
> activity. If he is not, the Commissioner next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental ability to do basic work activities. If
> the claimant suffers such an impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the
> claimant has such an impairment, the Commissioner will consider him [per se] disabled....
> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite
> the claimant's severe impairment, he has the residual functional capacity to perform his past work.
> Finally, if the claimant is unable to perform his past work, the Commissioner then determines
> whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d
Cir. 1998)).

C.F.R. Part 404, subpart P. (AR 32.) But at the fourth step, ALJ Nisnewitz, after consideration of the entire record, found that Medina did not have the residual functional capacity to perform even sedentary work. (*Id.*) The ALJ acknowledged that this finding was based, in part, on evidence supplied by Drs. Sodaro and Zolan. The ALJ held that the record evidence established that Medina's knee pain prevented him from sitting, standing, or walking for six hours in an eight-hour workday and that his right shoulder pain prevented him from effectively performing overhead activities and from lifting and carrying ten pounds. (*Id.*) However, the ALJ also held that Medina's ability to function was "further eroded due to sleep apnea" and his mental impairments, which reduced his "capacity for social interaction, daily activities, and sustained attention and concentration." (*Id.*)

At the fifth and final step, the ALJ determined that Medina could not return to his past relevant work as a police officer. (AR 34.) He then referred to the applicable medical-vocational guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2, which prescribed a finding of disabled. (AR 34–35.) The ALJ concluded that Medina had been under a disability, as defined in the Social Security Act, since September 30, 2007, through at least June 24, 2011 – the date of the decision. (AR 35.)

The Subsequent Criminal Proceedings

In 2014, Medina was indicted in connection with a sweeping investigation by the New York County District Attorney's Office into a large-scale Social Security Disability insurance fraud. The fraudulent scheme was described as follows by Judge Pauley of the United States District Judge for the Southern District of New York in a civil action involving other participants in the scheme:

> The masterminds of the scheme, the "Lavallee Group," approached retired police
> officers … and offered to prepare fraudulent applications for Social Security
> Disability Insurance ("SSDI") in exchange for cash kickbacks from the resulting
> SSDI benefits. The Lavallee Group sent [the retired officers] to selected mental-

> health professionals who provided documentation of psychiatric conditions such as post-traumatic stress disorder, anxiety disorder, and depression. [The retired officers] … used these diagnoses to file fraudulent SSDI applications, which were prepared by the Lavallee Group and contained substantively identical claims. Once they obtained the SSDI benefits, [the officers] paid the Lavallee Group in cash increments of less than $10,000.

*Blessinger v. City of New York*, No. 17-CV-108, 2017 WL 3841873, at *1 (S.D.N.Y. Sept. 1, 2017). Two of the members of the Lavallee Group were Lavallee and Hale. (AR 165.) In addition, Medina acknowledges that Drs. Sodaro and Zolan were alleged to have been involved in the scheme. (Medina Aff. ¶ 14.)

Since the indictment – New York County Indictment No. 794/2014 – is not part of the Administrative Record and has not been provided to the Court by the parties, it is unclear precisely what charges Medina was facing. Medina states that he was indicted for "grand larceny by false pretenses" – which is a theory of larceny – but does not specify the offenses with which he was charged. Medina's Memorandum of Law in Support of his Motion for Judgment on the Pleadings ("Medina's Memo") (Doc. No. 25) at 3.) The Commissioner states that Medina was indicted for grand larceny in the fourth degree but does not allege whether Medina was also facing other charges. (Commissioner's Memorandum of Law in Support of the Cross-Motion Doc. No. 27) at 3.) The minutes of Medina's plea and sentencing suggest that grand larceny in the fourth degree was either one count of a multi-count indictment or a lesser included offense of a count which charged Medina with grand larceny in the second degree. (Plea/Sentence Minutes (Doc. No. 25-4) at 2–3, 5.)

Regardless of the charges, it is undisputed that on July 11, 2014, Medina entered into a Plea Agreement. (AR 103–06.) That agreement resolved both the criminal case against Medina and related forfeiture action brought by the New York County District Attorney in his capacity as a "Claiming Authority." With respect to the criminal action, Medina admitted that on or around October 1, 2007, he knowingly and intentionally and acting in concert with others caused

11

false representations to be made to the SSA and the OTDA in order to obtain SSDI benefits. (AR 103–04.)  He further admitted that, by making these false representations, he collected unauthorized payments from the SSA in the amount of $143,154.10 between March 2008 and June 2013.  (AR 104).

The Plea Agreement provided that if Medina satisfactorily allocuted, the District Attorney would recommend a conditional discharge and 100 hours of community service.  That conditional discharge was conditioned on, among other things, Medina's payment of restitution. In paragraph 6 of the Plea Agreement, Medina agreed to pay restitution in the amount of $143,154.10 – "which represents the loss suffered by SSA" – and admitted being liable for that amount.  (AR 104.)  The Plea Agreement stated that the failure to pay would be a "material breach" of the Plea Agreement.  (*Id.*)

The conditional discharge was also conditioned on his settling the civil forfeiture action by stipulating to forfeit the $143,154.10.  With respect to the civil action, the Plea Agreement states that prior to the execution of the Plea Agreement, Medina would stipulate to settle the forfeiture action.  (AR 104.)  The Plea Agreement anticipated that the Forfeiture Stipulation would result in the entry of a Forfeiture Order.  The District Attorney would then move to dismiss "the civil suit … in conjunction with this matter."  (AR 105.)

On July 11, 2014, Medina appeared before Justice Daniel Fitzgerald in the Supreme Court of the State of New York, New York County, to enter his plea of guilty.  Medina did not allocute in the manner anticipated in the Plea Agreement.  Instead, Justice Fitzgerald read the top count of the indictment to Medina – which was grand larceny in the second degree – then asked if the facts stated in that charge were true.  (Plea/Sentence Minutes at 5–6.)  As a result, Medina admitted that between October 1, 2007, and December 20, 2013, he, acting in concert with others, "stole property from an owner, specifically the Social Security Administration, and the

12

value of that property exceeded $50,000." (*Id.* at 6.)  No one objected to the allocution and the judge accepted the plea.  (*Id.* at 7.)  Medina then waived the pre-sentence report, and the Justice Fitzgerald imposed the promised sentence.  (*Id.* at 8.)

The Redetermination Proceedings

On or before February 25, 2014, the New York County District Attorney's Office alerted the Commissioner to the Lavellee Group's scheme.  (Doc. No. 25-2, Ex. F.)  Subsequently, the Commissioner learned, from either the New York District Attorney's Office and/or the SSA's Office of the Inspector General ("OIG") that Medina had pled guilty to obtaining through false representations SSDI benefits to which he was not entitled.  (AR 6.)

On April 20, 2017, Administrative Appeals Judges Christopher S. Hargis and Sunmee Jo issued a Notice of Appeals Council Action, (AR 165–68), advising Medina that the Appeals Council was redetermining his entitlement to disability benefits pursuant to section 205(u) of the Social Security Act, 42 U.S.C. § 405(u).  That Notice referenced Medina's guilty plea and stated that, since the Appeals Council was "not allowed to consider any evidence submitted in connection with [his] application for benefits" in redetermining his case, there was insufficient evidence to support his entitlement to disability benefits.  (AR 165–66.)  The Appeals Council stated that it planned to issue a decision holding that Medina was not disabled from September 20, 2007, through June 24, 2011, the date of ALJ Nisnewitz's decision, because the evidence did "not establish a severe, medically determinable impairment to support a finding of disability during the relevant period at issue."  (AR 166.)  The Notice gave Medina 30 days in which to submit "more evidence or a statement about the facts and the law" relating to his case, but noted that the Appeals Council could consider more evidence only if it was "new and material" and related to a disability starting on or before June 24, 2011.  (AR 166–67.)  The Notice also stated

that Medina could seek an extension of the 30-day period, but that the Appeals Council would issue a decision if it did not hear from Medina within the 30 days.  (*Id.*)

On June 7, 2017, the Appeals Council, believing that Medina had not responded to the Notice, entered a decision holding that there was "insufficient evidence to support [Medina's] entitlement to benefits under the application filed on June 11, 2008."  (AR 8.)  The Appeals Council provided two bases for that decision.  First, as proposed in the Notice, it disregarded all evidence submitted in connection with Medina's application and found that the record no longer established a severe, medically determinable impairment during the relevant period at issue. (AR 7.)  Second, noting that the DISCO DIB Insured Status Report, (AR 126–27), revealed that Medina had earned $19,743.97 in calendar year 2008, the Appeal Council held that Medina had engaged in substantial gainful activity since September 30, 2007, (AR 7).  Accordingly, the Appeals Council terminated Medina's entitlement to benefits.  (AR 8.)

On July 20, 2017, an attorney retained by Medina – Joseph W. Murray – wrote to the Appeals Council requesting that it reopen its decision.  (AR 171–72.)  In that letter (hereafter, "Murray's First Letter"), Murray implied that the Appeals Council had overlooked his May 18, 2017, letter requesting an extension of the 30-day deadline.  (AR 169.)  Murray not only attached a copy of that letter, but attached some new evidence: a six-page report from Donald I. Goldman, M.D., to Murray, dated June 9, 2017; a one-page letter from Lennon Turner, MPH, to Medina dated June 27, 2017; and a handwritten, two-page letter from Claudia Smuglin, M.D., dated July 3, 2017.

The letter from Dr. Donald Goldman – an orthopedic surgeon and a Fellow of the American Academy of Disability Evaluating Physicians – stated that he had examined Medina in orthopedic surgical consultations on at least two occasions:  initially, on October 16, 2013, and most recently on June 1, 2017.  (Doc. No. 25-2, Ex. K2, at 1–2.)  Although the doctor's letter

14

stated that he was going to compare the two examinations, (*id*. at 2), the letter only provided the findings of the June 2017 examination and evaluated Medina's residual functional capacity as of that date. Dr. Goldman's report included a review of Medina's surgical history, and summarized Dr. Lanzone's assessments of Medina's functionality. (*Id.* at 3–4.) But, because Dr. Goldman first saw Medina in 2013, the doctor did not, and could not, offer an opinion as to Medina's condition or RFC prior to that date.

The letter from Dr. Smuglin, a psychiatrist, stated that Medina had been under her care since March 31, 2014. (Doc. No. 25-2, Ex. M2, at 1.) She further stated that she had treating Medina for recurrent, severe Major Depressive Disorder and chronic PTSD with individual psychotherapy, relaxation techniques, and various medications. (*Id.*) However, because Dr. Smuglin began treating Medina in 2014, she did not, and could not, offer an opinion as to Medina's condition prior to that date. Rather, she opined only that he continued to have symptoms of clinical depression and PTSD and remained in need of further psychiatric care. (*Id.* at 2.)

The letter from Mr. Turner, the Lead Scientist for Panel Maintenance at the World Trade Center Health Registry, was a cover letter, enclosing "a report with [Medina's] answers regarding [his] 9/11 exposures and experiences taken from [his] 2003–04 WTC Health Registry survey." (Doc. No. 25-2, Ex. L2.) Turner's letter stated that Medina's eligibility to enroll in the registry was based on the information that he himself had provided, and that neither his "eligibility nor self-reported symptoms on the 2003–04 Registry survey were independently verified by Registry personnel." (*Id.*) The letter further stated: "Registry staff did not conduct any physical exams or screenings at enrollment." (*Id.*)

Although Murray's First Letter did not request a further extension of time in which to submit evidence, Murray sent the Appeals Council a second letter (hereafter, "Murray's Second

Letter") on September 15, 2017.  That submission acknowledged that Medina had "pled guilty in the case against him," (Murray's Second Letter (Doc. No. 25-2) at 1), but sought to portray Medina as "a victim of the fraud," allegedly "perpetrated without Medina's knowledge by … Hale," (*id.* at 2).  Murray's Second Letter alleged that the SSA violated Medina's due process rights by failing to conduct the redetermination immediately upon learning of the New York County District Attorney's investigation into the Lavallee Group, and asserted that Medina would not have been implicated in the wrongdoing if the SSA had taken down the Lavallee Group when it first learned of their scheme.  (*Id.* at 3.)  The letter also accused the SSA and New York County District Attorney's Office of violating Medina's rights under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") by introducing portions of Medina's confidential SSDI file into evidence at the criminal trial of another defendant without Medina's consent and over his objection.  (Murray's Second Letter at 4.)

Murray's Second Letter attached 30 exhibits, which Murray characterized as containing "overwhelming documentary medical evidence to support the conclusion that he was completely disabled by his combination of impairments."  (*Id.*)  Of the 30 exhibits, only 20 were medical records or opinions.  Seven of the 20 were documents already included in the Administrative Record or attached to Murray's First Letter.  Of the remaining 13 documents, all but two – a one-page note Dr. Smuglin wrote on November 10, 2015, to excuse Medina from jury duty, (Murray's Second Letter, Ex. I2), and voluminous pharmacy records, (*id.*, Ex. J2) – related either to cardiac problems or sinus, nasal, and pulmonary problems which had not been raised in the initial SSDI application.  Notably, neither of Murray's letters addressed the question of whether Medina engaged in substantial gainful activity in calendar year 2008.

On September 21, 2017, the Appeals Council issued its decision, holding that Medina "was not disabled as defined in the Social Security Act at any time from September 30, 2007, the

alleged onset date, through June 24, 2011, the date of the Administrative Law Judge's decision."

(AR 362.)  The Appeals Council granted Murray's July 20, 2017, request to reopen the case and

considered the evidence attached to Murray's First Letter, as well as three documents the

Appeals Council received from "the beneficiary":  a Disability Report – Adult (Form SSA-

3368), a Disability Report – Field Office (Form SSA-3367), and a copy of Dr. Tranese's report.

(AR 356, 360–61.)  However, the Appeals Council held that the latter three documents were

duplicative of documents already contained in the Administrative Record; that Dr. Donald

Goldman and Dr. Smuglin began treating Medina years after June 24, 2011, and therefore could

not opine as to his condition prior to that date; and that the Turner letter attached information

about Medina's "self-reported symptoms" but did not "reflect any specific medical findings or

evaluation."  (AR 360–61.)  The Appeals Council made no mention of having received Murray's

Second Letter, and did not expressly consider any of the evidence attached thereto.  The Appeals

Council also disregarded all evidence submitted in connection with Medina's application for

benefits, noting that the Social Security Act required it to do so "because fraud was involved in

providing that evidence."  (AR 360.)

  The Appeals Council then redetermined the ALJ's decision, and denied benefits on two

grounds.  First, the Appeals Council held that Medina engaged substantial gainful activity in

calendar year 2008, though he did not engage in substantial gainful activity between January 1,

2009, and June 24, 2011.  (AR 362.)  Second, the Appeals Council held that, after excluding all

the evidence described above, there was no longer evidence of "any medically determinable

impairment[,] or combination of impairments, which had more than a minimal effect on his

ability to do basic work activities."  (*Id.*)  Since Medina failed to make the showing of a "severe

impairment," as required at step two of the five-step analysis, the Appeals Council held that there

was insufficient evidence to support his Medina's entitlement to Social Security benefits.  (AR

17

362–63.) The Appeals Council terminated Medina's entitlement, (AR 363), and sent him a Notice which informed him of the final decision of the Commissioner and his right to seek judicial review of that decision, (AR 356).

<u>This Action</u>

On November 24, 2017, Medina, still represented by Murray, commenced this action, principally requesting that the Court modify the Commissioner's decision and grant Medina the maximum monthly SSDI benefits. His complaint (Doc. No. 1) contained three causes of action, the first two of which alleged violations of Medina's procedural due process rights. The first cause of action alleged that the Commissioner failed to provide Medina an opportunity to have a hearing before an ALJ either before or after reaching the determination that there was insufficient evidence to support his entitlement to SSDI benefits. (Complaint ¶¶ 9–12.) The second cause of action alleged that the Commissioner denied Medina a meaningful opportunity to challenge the initial determination that fraud was involved in the preparation of Medina's SSDI application and that the SSA's rulings and procedures manual deprived any ALJ and/or members of the Appeals Council the discretion to determine whether the evidence contained in that application was fraudulent. (*Id.* ¶¶ 15–16.) The third cause of action alleged that the Commissioner's redetermination was erroneous, unsupported by substantial evidence, and/or contrary to law.

Medina and the Commissioner now cross-move for judgment on the pleading pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The first two points in Medina's Memo, dated April 4, 2019, (Doc. No. 25), largely expand on the due process arguments raised in the complaint's first two causes of action. First, citing to *Hicks v. Commissioner of Social Security*, 909 F.3d 786 (6th Cir. 2018), Medina argues that he was not permitted "a fair opportunity to rebut" an assertion by the SSA's OIG that fraud was involved in his claim of disability. Medina

18

notes that some evidence of disability, such as that provided by Dr. Lanzone, preceded his criminal activity and was untainted by fraud.  Second, citing to the SSA's Hearing, Appeals, & Litigation Law Manual ("HALLEX") I-1-3-25(C)(5), which addresses when a hearing is necessary before redetermination, Medina argues that he should have been granted a hearing into what evidence from his initial application was tainted.

The third and fourth points in Medina's Memo contain arguments which, although raised before the Appeals Council, were not raised in the complaint.  In the third point, Medina notes that 42 U.S.C § 405(u)(1)(A) requires the Commissioner to perform a redetermination of benefits "immediately" upon a finding of fraud, that the New York County District Attorney's Office informed the Commissioner of the Lavellee Group's fraudulent scheme in February 2014, but that the Commissioner waited for three years before commencing the redetermination proceedings against him.  Medina asserts that this delay rendered the redetermination "improper" and that Medina is, for some unexplained reason, entitled to have his SSDI benefits reinstated in full.  In the fourth point, Medina asserts that the money he received in 2008 was "back pay" resulting from negotiations between the NYPD and the City of New York, and that the Appeals Council erred in finding that he engaged in substantial gainful activity in calendar year 2008.

The Commissioner's Memo, (Doc. No. 27), argues that the Appeals Council properly followed the statutory mandate of 42 U.S.C. § 405(u).  With respect to Medina's claim that he was denied due process because he was not permitted a full and fair opportunity to rebut the OIG's findings of fraud, the Commissioner argues that the Appeals Council "properly afforded issue-preclusive effect to [Medina's] admissions in his guilty plea, in connection with which [he] had already been given a full and fair process."  (Commissioner's Memo at 12.)  With respect to Medina second due process argument, the Commissioner, citing SSR 16-1p, 2016 WL 931538 (March 14, 2016), argues that the Appeals Council was required to disregard all evidence

19

supplied by Medina, (Commissioner's Memo at 17–18), and that Medina's reliance on the

general provisions of HALLEX I-1-3-25(C)(5) is misplaced because it ignores the more specific

provisions of HALLEX I-5-6-4, which dictates how to conduct redeterminations of claims

brought by participants in the Lavallee scheme, (Commissioner's Memo at 20).

The Commissioner makes two arguments with respect to Medina's claim that the

Commissioner improperly delayed the redetermination.  First, the Commissioner argues that 42

U.S.C. § 405(u) serves to protect the SSA, and does not provide a private right of action to

claimant for delays in the redetermination process.  (*Id.* at 22.)  Second, the Commissioner notes

that Medina has not explained how he was prejudiced by the delay.  (*Id.*)

The Commissioner does not address the merits of Medina's claim that the Appeals

Council erred in finding that he engaged in substantial gainful activity in 2008.  Rather, the

Commissioner notes that the Appeals Council "proceeded past step one of the sequential

evaluation process," finding insufficient evidence of a medically determinable impairment at step

two.  (*Id.* at 22, n. 11.)  The Commissioner reasons that even if the Appeals Council's

determination at step one was erroneous, that error had no bearing on the decision to deny

entitlement to benefits and was, therefore, harmless.  (*Id.*)

**STANDARD OF REVIEW**

A final determination of the Commissioner of Social Security upon an application for SSI

benefits is subject to judicial review as provided in 42 U.S.C. § 405(g).  *See* 42 U.S.C. §

1383(c)(3).  A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner

is limited to determining whether the SSA's conclusions were supported by substantial evidence

in the record and were based on a correct legal standard.  *Lamay v. Comm'r of Soc. Sec.*, 562

F.3d 503, 507 (2d Cir. 2009); *see Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The

district court has the "power to enter, upon the pleadings and transcript of the record, a judgment

affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

"Substantial evidence" connotes "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).  "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn."  *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).  The "substantial evidence" test applies only to the Commissioner's factual determinations.  Similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation.  *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."  *Johnson*, 817 F.2d at 986.  However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration.  *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

## DISCUSSION

A.  The Redetermination Process

The redetermination procedure at issue in this case was enacted as part of the Social Security Independence and Program Improvements Act of 1994, and is codified as section

205(u) of the Social Security Act, 42 U.S.C. § 405(u).  This provision requires the Commissioner to:

> immediately redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits, unless a United States attorney, or equivalent State prosecutor, with jurisdiction over potential or actual related criminal cases, certifies, in writing, that there is a substantial risk that such action by the Commissioner of Social Security with regard to beneficiaries in a particular investigation would jeopardize the criminal prosecution of a person involved in a suspected fraud.

42 U.S.C. § 405(u)(1)(A).  "When redetermining the entitlement, or making an initial determination of entitlement, of an individual under this subchapter, the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence."  42 U.S.C. § 405(u)(1)(B). "If, after redetermining pursuant to this subsection the entitlement of an individual to monthly insurance benefits, the Commissioner of Social Security determines that there is insufficient evidence to support such entitlement, the Commissioner of Social Security may terminate such entitlement and may treat benefits paid on the basis of such insufficient evidence as overpayments."  42 U.S.C. § 405(u)(3).

On March 14, 2016, the Commissioner issued Security Ruling (SSR) 16-1p to explain the process the SSA used to redetermine an individual's entitlement to or eligibility for benefits when there is reason to believe that fraud or similar fault was involved in that individual's application for benefits.  As the SSR 16-1p itself notes, "SSRs do not have the same force and effect as statutes or regulations."  SSR 16-1p, 2016 WL 1029284, at *1.  However, "Social Security rulings are entitled to deference except when they are plainly erroneous or inconsistent with the Social Security Act."  *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (summary order) (quoting *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995)).  In addition, SSRs "are

binding on all components of the Social Security Administration."  SSR 16-1p, 2016 WL 1029284, at *1 (citing 20 CFR 402.35(b)(1)).

Under SSR 16-1p, "any individual or entity whose actions affect an individual's application for monthly benefits" may be found to have committed fraud or similar fault.  SSR 16-1p (A)(4), 2016 WL 1029284, at *3.  The term "any individual or entity" includes "a claimant, beneficiary, auxiliary, recipient, spouse, representative, medical source, translator, interpreter, and representative payee."  *Id.*  The SSA "will disregard any evidence supplied, prepared, or signed by a source when there is a reason to believe that the source provided the evidence knowing it was incorrect or incomplete or concealed information knowing it was material to the determination, even if it includes a report prepared or signed by another source, such as lab findings and x-rays."  SSR 16-1p(C)(2)(a), 2016 WL 1029284, at *4.  However, during the redetermination, the SSA "will consider evidence that was provided absent fraud or similar fault, and that relates to the individual's entitlement and eligibility from the time of the individual's original allowance, even if that evidence was not presented previously."  SSR 16-1p(A)(5), 2016 WL 1029284, at *3.  In addition, "If the individual believes he or she is currently disabled, he or she may file a new application while appealing" the SSA decision on redetermination.  SSR 16-1p(A)(8), 2016 WL 1029284, at *3.

Applying SSR 16-1p, HALLEX provides a specific redetermination procedure to be used by its Office of Appellate Operations ("OAO") as to redetermining the applications of SSDI beneficiaries who participated in the Lavallee Group's scheme.  HALLEX I-5-6-4(II)(A) directs the OAO employees to verify that "the beneficiary's plea agreement contains admissions that the beneficiary knowingly and intentionally made false representations to SSA in order to obtain disability benefits."  If the plea agreement contains such an admission, the employees are to "[d]isregard all evidence in the claim(s) file under section 205(u) of the Social Security Act,"

23

(*id.*), and to send a notice prescribed by HALLEX I-5-6-4(II)(B).  If, in response to that notice, "the beneficiary submits additional evidence showing a new critical or disabling mental condition that does not relate to the period at issue [or] if the beneficiary submits evidence showing a physical impairment (whether during or after the period at issue), … OAO staff will inform the beneficiary that he or she may file a new application."  HALLEX I-5-6-4(II)(C).

In this case, the Appeals Council followed the procedures set forth in SR 16-1p and HALLEX I-5-6-4 to the letter.  According to their decision dated June 7, 2017, the Appeals Council was alerted to the Lavellee Group's scheme by both the New York District Attorney's Office and the OIG and knew that Medina had pled guilty to obtaining through false representations SSDI benefits to which he was not entitled.  (AR 6.)  Since there was reason to believe that fraud or similar fault was involved in Medina's SSDI application, the Appeals Council was required to initiate redetermination proceedings.  *See* 42 U.S.C. § 405(u)(1)(A).  Moreover, since Medina's plea agreement contained admissions that the beneficiary knowingly and intentionally made false representations in his SSDI application in order to obtain disability benefits, (AR 103–04), the Appeals Council was required to disregard all evidence in Medina's claim file in making that redetermination.  *See* SSR 16-1p(C)(2)(a); HALLEX I-5-6-4(II)(A).

In accordance with HALLEX I-5-6-4(II)(B), the Appeals Council sent Medina a notice dated April 20, 2017, informing him that, since the Appeals Council was "not allowed to consider any evidence submitted in connection with [his] application for benefits" in redetermining his case and that, absent this evidence, there was insufficient evidence to support his entitlement to disability benefits.  (AR 165–66.)  The notice stated that the Appeals Council planned to issue a decision holding that Medina was not disabled from September 20, 2007, through June 24, 2011, but gave Medina 30 days in which to submit "more evidence or a statement about the facts and the law" relating to his case.  (AR 166.)  The notice advised

24

Medina that the Appeals Council could only consider evidence that was "new and material" and related to a "disability" starting on or before June 24, 2011.  (AR 167.)

Apparently unaware that Medina requested an extension of the 30-day period, the Appeals Council terminated Medina's benefits on June 7, 2017.  Since the Appeals Council could not consider the evidence introduced by Medina (or Hale or Lavallee on his behalf), there was unquestionably "insufficient evidence to support [Medina's] entitlement to benefits under the application filed on June 11, 2008."  (AR 8.)  Indeed, there was no medical evidence whatsoever.

Murray's First Letter, dated July 20, 2017, advised the Appeals Council that it had overlooked Medina's request for an extension, and requested that the Appeals Council reopen its decision and consider three items of new evidence: a report from Dr. Donald Goldman, dated June 9, 2017; a letter from Lennon Turner, MPH, to Medina dated June 27, 2017; and a handwritten letter from Claudia Smuglin, M.D., dated July 3, 2017.  (AR 171.)  Murray's First Letter did not state or imply that Medina wanted to introduce any new evidence aside from these three items, much less request additional time to do so.

In its September 21, 2017, decision, the Appeals Council granted Medina's request to reopen and considered the three pieces of new evidence.  The Appeals Council correctly noted that since Drs. Goldman and Smuglin first treated Medina years after ALJ Nisnewitz rendered his decision on June 24, 2011, their reports could not contain evidence and opinions relating to the period between September 30, 2007, and June 24, 2011.  (AR 360.)  In addition, the Appeals Council correctly noted that the Turner letter attached information about Medina's "self-reported symptoms" but did not "reflect any specific medical findings or evaluation."  (AR 360–61.)  The Appeals Council also considered three documents received directly from Medina – (AR 356,

360–61) – but noted that these were copies of documents contained in Medina's original SSDI application.  (*See* AR 128–35; 140–42; 287–90. )

After considering the evidence attached to Murray's First Letter and the evidence provided by Medina, there was still no evidence of any medical impairments, much less severe medical impairments.  Accordingly, the Appeals Council correctly held that Medina's SSDI claim failed at the second step of the five-step analysis.  Since the Appeals Council applied the correct legal principles and since its conclusions were supported by substantial evidence, its redetermination to terminate Medina's entitlement to SSDI benefits is affirmed.[7]

To be sure, there was new evidence attached to Murray's Second Letter.  However, there is no indication that this letter, dated September 15, 2017, arrived before September 21, 2017, when the Appeals Council issued its final decision.  That decision discussed the evidence attached to Murray's First Letter in some detail, but makes no mention of Murray's Second Letter or the voluminous attachments thereto.

Moreover, the Murray's Second Letter did not contain medical or psychiatric evidence which would have established Medina's disability during the relevant period.  Aside from seven documents which were already contained in the Administrative Record, only two documents – a one-page note Dr. Smuglin wrote on November 10, 2015, to excuse Medina from jury duty, (Murray's Second Letter, Ex. I2), and voluminous pharmacy records, (*id.*, Ex. J2) – related to the disabilities alleged in Medina's SSDI application.  In her note, Dr. Smuglin again noted that she

---

[7] Since the Court has determined that the Appeals Council correctly denied Medina's application at step two, the Court need not consider the question of whether the Appeals Council was correct when, at step one of the analysis, it determined that Medina engaged in significant gainful employment in 2008.  However, the Court notes that this decision was also correct.  Annual earnings in excess of amounts calculated in accordance with the formula set forth in 20 C.F.R. § 404.1574(b)(2) create a rebuttable presumption of substantial gainful employment.  *See Patterson v. Colvin*, No. 14-CV-6224P, 2015 WL 5036934, at *16 (W.D.N.Y. Aug. 26, 2015).  In 2008, the amount was $940 a month, or $11,280 a year.  *Id.*  The DISCO DIB showed that Medina earned $19,743.97 in 2008, (AR 127), and there was no evidence in the Administrative Record to rebut the presumption that Medina was engaged in substantial gainful employment in 2008.

had not begun treating Medina until 2014, several years after the ALJ's June 24, 2011, decision. And the pharmacy records – although relating to the period between September 30, 2007, and June 24, 2011 – did not by themselves establish a severe impairment. The other documents attached to Murray's Second Letter related to cardiac problems or sinus, nasal, and pulmonary problems which had not been raised in the initial SSDI application.

B. The Due Process Challenges

Medina's due process arguments rely on authority which is not controlling and/or inapplicable to the circumstances of this case. Medina's first argument – that he was not permitted "a fair opportunity to rebut" the OIG's finding that fraud was involved in Medina's application – principally relies on *Hicks v. Commissioner of Social Security*, a 2018 Sixth Circuit case which held that the SSA's refusal to accord beneficiaries fair opportunity to rebut assertions that medical reports were fraudulent constituted deprivations of the minimum protections of procedural due process. However, since *Hicks* is a Sixth Circuit opinion, it is not controlling on this Court. Even if it were, Medina is collaterally estopped from raising the arguments raised in *Hicks*.

1. Collateral Estoppel

Courts have long recognized that "the determination of a question directly involved in one action is conclusive as to that question in a second suit." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 147 (2015) (quoting *Cromwell v. County of Sac*, 94 U.S. 351, 354 (1877)). "In order for collateral estoppel to apply the court must determine that '(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.'" *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 86 (2d Cir. 2000) (quoting *NLRB v.*

27

*Thalbo Corp.*, 171 F.3d 102, 109 (2d Cir. 1999)).  "[A] criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *Id.* (quoting *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978)).  To determine what that previous criminal proceeding "necessarily decided, … a court must 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter.'" *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 359 (2016) (quoting *Ashe v. Swenson*, 397 U.S. 436, 444 (1970)).

In this case, Medina was charged with acting in concert with Lavellee, Hale, and others to commit grand larceny in the second degree.  Under New York law, "a person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof."  N.Y. Penal Law § 155.05(1).  Larceny can be committed in a number of ways, including by "obtaining property by false pretenses."  *Id.* § 155.05(2)(a).  "With regard to larceny by false pretenses, the Penal Law incorporates the historical elements that were applied at common law, i.e., a false material statement about a past or presently existing fact."  *People v. Norman*, 85 N.Y.2d 609, 619 (1995).  Accordingly, a person is guilty of larceny by false pretenses "when that person makes a false representation of a past or existing fact while aware that such representation is false, and obtains possession and title to the property as a result of the owner's reliance upon such representation."  N.Y. Crim. Jury Instructions, § 155.05 (instructions for "Alternative Theories of Larceny").

In his plea agreement, Medina agreed to plead guilty to grand larceny in the fourth degree on the theory that he, knowingly and intentionally and acting in concert with others, caused false representations to be made in order to obtain SSDI benefits.  (AR 103–04.)  He admitted that, as

a result of these false representations, he collected unauthorized payments from the SSA between March 2008 and June 2013 of $143,154.10.  (AR 104.)  In addition, he agreed to forfeit that money and to pay restitution in that amount.  (*Id.*)  In light of these admissions, Medina is estopped from arguing – as did the plaintiffs in *Hicks* – that he was denied a full and fair opportunity to contest the OIG's finding that fraud or similar fault was involved in his application for SSDI benefits.

Medina is correct in arguing that the prior criminal proceedings did not determine that all of the evidence included in Medina's SSDI application was fraudulent.  However, his argument ignores the SSA's interpretation of § 405(u), as set forth in SSR 16-1p.  That Social Security Ruling required that the Appeals Council ignore any evidence supplied by a claimant who admitted to fraud in the preparation of the application.  *See* SSR 16-1p(C)(2)(a), 2016 WL 1029284, at *4.  While that Social Security Ruling does not have the same force and effect as a statute or regulation, *see* SSR 16-1p, 2016 WL 1029284, at *1, it is not plainly erroneous or inconsistent with the Social Security Act and is entitled to deference.  *See Genier*, 298 F. App'x at 108; *Gordon*, 55 F.3d at 105.

### 2. Entitlement to a Hearing

The Court also rejects Medina's claim that he was denied due process because the Appeals Council failed to afford him a hearing before the ALJ.  HALLEX I-5-6-4(II)(C), which specifically addresses the question of whether a hearing may be held in connection with the redetermination process, provides that "[a]bsent unusual circumstances, adjudicators will not conduct additional hearing proceedings to develop the evidentiary record in these cases."  To be sure, HALLEX I-5-6-4(II)(C) states that the "OAO will generally offer a hearing when [1] [t]he favorable decision was issued without a hearing; or [2] [t]he favorable decision was issued after a minimal hearing where the beneficiary or recipient offered little or no testimony."  However,

the use of the word "generally" indicates that a claimant does not have an absolute right to such a hearing.

In this case, Medina has not explained what, if any, evidence he could offer at a hearing that would establish his disability.  While Medina might be able to testify to his functional limitations, his testimony alone could not establish that these limitations were caused by a medically determinable impairment.  Thus, even assuming that ALJ Nisnewitz never conducted a hearing or that Medina provided little or no testimony at that hearing, Medina has not established that he was prejudiced by the failure to conduct a hearing.

C. The "Immediacy" Requirement

As noted above, Medina also argues that the redetermination proceeding was "improper" because the SSA did not commence the proceeding for several years after being informed by the New York County District Attorney's Office of the Lavellee Group's fraudulent scheme.  As Medina correctly notes, 42 U.S.C § 405(u)(1)(A) requires the Commissioner to perform a redetermination of benefits "immediately" upon a finding of fraud.  However, as the Commissioner correctly argues, Medina does not have a private right of action for this delay.

"When analyzing whether a statute implies a private right of action, our 'interpretive inquiry begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action.'"  *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288 n.7 (2001)); *see also Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011).  A federal statute can create a private cause of action expressly or by implication, *Republic of Iraq v. ABB AG*, 768 F.3d 145, 170 (2d Cir. 2014), but if "[n]o provision of [a statute] explicitly provides for a private right of action for violations of [specific provisions of that statute], ... we must presume that Congress did not intend one."  *Doe v. Merck & Co.*, 803 F. App'x 559, 560 (2d Cir. 2020) (summary

order) (quoting *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429, 432 (2d Cir. 2002)) (alterations in *Doe*).  A court can only find an implied cause of action where "the underlying statute can be interpreted to disclose the intent to create one."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 164 (2008).  The key is ascertaining whether the statute "'displays an intent to create not just a private right but also a private remedy.'"  *Republic of Iraq*, 768 F.3d at 170 (quoting *Sandoval*, 532 U.S. at 286).  Ultimately, the statute's text and structure must "yield a clear manifestation of congressional intent to create a private cause of action before a court can find such a right to be implied."  *Lopez*, 662 F.3d at 596.

Nothing in 42 U.S.C § 405(u) expressly creates a private right of action.  Thus, the Court must presume that Congress did not intend to create one.  *See Doe*, 803 F. App'x at 560; *Olmsted*, 283 F.3d at 432.  Medina has not overcome that presumption by pointing to anything in the statute's text and structure that manifests Congressional intent to create a private right of action, and the Court's own review of the statute finds nothing to suggest such intent.  Accordingly, the Court cannot find that § 405(u) implies a private right of action.  *See Lopez*, 662 F.3d at 596.  Moreover, even if a private right of action existed, there is nothing to suggest that the proper remedy for the Commissioner's failure to comply with the immediacy requirement would be waiver of the statutorily mandated redetermination process.

**CONCLUSION**

For the reasons set forth herein, Medina's motion for judgment on the pleadings is denied, and the Commissioner's cross-motion for judgment on the pleadings is granted.  The Commissioner's final decision is affirmed, and this action is dismissed.

The Clerk of Court is respectfully directed to enter judgment for the Commissioner and close this case.

SO ORDERED.

Dated: Brooklyn, New York
      November 30, 2020

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge